1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8   Tribal Behavioral Health LLC, et al.,      )   No.  CV-22-00926-PHX-SPL
                                                )
9                                               )
                      Plaintiffs,               )
10                                              )   **ORDER**
    vs.                                         )
11                                              )
                                                )
12  John R. Reeves III, et al.,                 )
                                                )
13                    Defendants.               )
                                                )
14  _____   )

15          Before the Court is Plaintiffs Tribal Behavioral Health LLC's and Tribal Health

16  LLC's (collectively, "Plaintiffs") Motion for Temporary Restraining Order ("TRO") and

17  Preliminary Injunction (Doc. 2).[1] On May 31, 2022, the Court denied the Motion's request

18  for a TRO, set an expedited briefing schedule for the parties, and set a Preliminary

19  Injunction Hearing (the "Hearing") before this Court. (Doc. 9). The parties have fully

20  briefed the Motion (Docs. 2, 16, 17) and the Hearing was held on June 14, 2022 (Doc. 24).

21  Having read the parties' briefs and having heard their arguments, the Court now issues this

22  Order granting Plaintiffs' Motion in part and as modified.

23      **I.      BACKGROUND**

24          Plaintiff Tribal Health LLC ("Tribal Health") is a company that focuses on

25  Indigenous healthcare. (Doc. 2 at 2). Plaintiff Tribal Behavioral Health LLC ("TBH") is

26

27          [1] Although the Motion's title refers only to a TRO, it also seeks a preliminary
    injunction. (Doc. 2 at 2 ("Plaintiffs seek a [TRO] and preliminary injunction to maintain
28  the status quo until the parties can resolve this dispute through litigation.")).

an affiliated company formed by John Shufeldt, M.D., in September 2021 to develop and operate behavioral health centers on tribal lands by using Tribal Health's reputation, relationships, and expertise. (*Id.*).

On October 1, 2021, TBH retained Defendant John R. Reeves III ("Defendant") as a consultant to assist with business development. (Doc. 1 at 2). Dr. Shufeldt had previously contacted Defendant in "late February or early March 2021" and asked whether Defendant would be interested in partnering with him "to build and develop destination treatment centers with a behavioral health focus." (Doc. 16 at 5). During that conversation and the others that followed, Defendant alleges that Dr. Shufeldt implied the venture would be a partnership between them. (*Id.*). Defendant argues that he only agreed to the consulting work in October 2021 based on Dr. Shufeldt's repeated promises that Defendant would be an equal partner and owner of TBH. (*Id.* at 1). He signed a Consulting Services Agreement with TBH under which he agreed to keep the company's Confidential Information in strict confidence and to not disclose or use it, except in performing his services. (Doc. 1 at 2). In October 2021, Defendant began pursuing opportunities on TBH's behalf by relying on his pre-existing experience with Indigenous healthcare and relationships with Indigenous communities. (*Id.*; Doc. 16 at 3–4). One such opportunity involved the conversion of an old casino into a behavioral health center for the Elk Valley Rancheria Tribe ("Elk Valley") in Del Norte County, California (the "County"). (Doc. 16 at 9). Defendant asserts that the project was first proposed to him by LaWanda Green—an Elk Valley councilmember—in early 2020. (*Id.*). According to Ms. Green, she and Defendant spoke about the idea again in May 2021. (Doc. 16-1 at 15). However, no other significant advances were made on the project until early 2022, once Defendant was a TBH consultant.

Sometime between October 2021 and April 2022, Defendant shared the Elk Valley opportunity with Dr. Shufeldt and TBH. On April 8, 2022, Defendant informed TBH that the tribe and the County were "on board" and "willing [to let TBH] manage the [behavioral health] services." (Doc. 2 at 4). On April 26, 2022, Defendant held a meeting with Elk Valley councilmembers and County supervisors in which he apparently introduced himself

as CEO and Partner of TBH, (Doc. 16-2 at 5), and presented the proposed behavioral health facility. (Doc. 2 at 4). All parties expressed interest in beginning development. (Doc. 1 at 3). The next day, Defendant followed up with the County via email. (*Id.*). The County again expressed interest in the project, and Defendant told the County that TBH would prepare a report for its review; on April 28, 2022, TBH retained Via Healthcare Consulting ("Via Healthcare") to prepare the report. (*Id.*). The report contained a feasibility analysis related to offering behavioral health services in the County and was intended to aid TBH in making a final presentation to the tribe and the County. (*Id.* at 5). All of this occurred while Defendant was contracted as a TBH consultant.

During this time, Defendant alleges that he still expected to become an equal partner with Dr. Shufeldt in the TBH venture and that he expressed this to Dr. Shufeldt on several occasions. (Doc. 16 at 7). Defendant alleges that he was also frustrated at the lack of progress, accountability, and structure at TBH. (*Id.*). On April 29, 2022, Defendant accepted a full-time, salaried position as CEO of TBH, (Doc. 1 at 4), still allegedly under the impression that he would eventually become equal partners with Dr. Shufeldt and own at least 50% of the company. (Doc. 16 at 7). He signed a Confidentiality and Non-Disclosure Agreement. (Doc. 1 at 4). On May 2, 2022 and May 3, 2022, respectively, Defendant and Dr. Shufeldt received emails identifying potential business opportunities with several tribes. (Doc. 2 at 6). The list of customer leads was generated "by a third-party B2B lead vendor, at TBH's cost." (*Id.*). On May 9, 2022, Defendant sent an email to Dr. Shufeldt and others stating that leads generated for TBH "were to be sent '[his] way' for review and further triage[d] according to whether prospective tribal customer leads were interested in funding, operations/facilities, or staffing services." (*Id.* at 6–7). Plaintiffs allege that Defendant was "position[ing] himself as the direct recipient of confidential sales and marketing leads generated for the exclusive benefit of TBH." (*Id.* at 7).

On May 7, 2022, Defendant learned—apparently for the first time—that there were two other partners who owned TBH in addition to Dr. Shufeldt and that Defendant would never own more than 30% of the company. (Doc. 16 at 7). On May 11, 2022, Via

Healthcare sent Defendant the report it produced concerning the Elk Valley project. (Doc. 1 at 5). Plaintiffs allege that, to this day, Defendant has failed to turn over the Via Healthcare report to TBH. (*Id.*). On May 15, 2022, Defendant emailed Dr. Shufeldt and reiterated his desire for a partnership/two-way deal. (*Id.* at 6). Dr. Shufeldt declined and on May 15, 2022, Defendant resigned as CEO. (*Id.*). After Defendant's resignation, TBH sent a letter to Defendant and reminded him of his duty of confidentiality and warned him against interference or usurpation of TBH's corporate opportunities, including the Elk Valley project. (*Id.*). TBH demanded that Defendant turn over the Via Healthcare report, which TBH claimed was "Confidential Information." (*Id.*). On May 19, 2022, TBH paid $25,500 to Via Healthcare for the report; the next day, Via Healthcare sent an invoice to TBH indicating that TBH still owed an additional $25,500 for the report, bringing its total cost to $51,000. (*Id.*).

Defendant maintains that the business opportunities were based on his pre-existing contacts and that he has a right to pursue the projects on his own, including the Elk Valley project, because they were pending before TBH was even formed. (Doc. 16 at 8). On May 27, 2022, Plaintiffs filed a Complaint (Doc. 1) and a Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2). Plaintiffs bring claims against Defendant for (i) breach of fiduciary duty, (ii) breach of non-disclosure agreement, (iii) intentional interference with business expectancy, (iv) misappropriation of trade secrets, and (v) unjust enrichment.[2] (Doc. 1 at 7–12). On May 31, 2022, the Court denied Plaintiffs' Motion for TRO on notice grounds. (Doc. 9). Plaintiffs seek injunctive relief to prevent Defendant from using his position as fiduciary and former-CEO of TBH to effectively steal the entirety of TBH's new business. (Doc. 2 at 8). Defendant argues Plaintiffs have no grounds to enjoin him from pursuing business opportunities with his own, pre-existing contacts.

---

[2] Plaintiffs additionally name Pui Reeves—the wife of Mr. Reeves—as a Defendant in this matter. (Doc. 1 at 1). However, because the facts most relevant to deciding this Motion relate to Mr. Reeves and not to Mrs. Reeves, the Court will generally refer only to Mr. Reeves as being the Defendant.

(Doc. 16 at 8). Defendant maintains that the projects, including the Elk Valley project, are his own and that he only shared them with TBH based on Dr. Shufeldt's promise they would be equal partners. (*Id.* at 11).

## II.    **LEGAL STANDARD**

A party seeking injunctive relief under Rule 65 of the Federal Rules of Civil Procedure must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.[3] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014); *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105-06 (9th Cir. 2012); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "The basic function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988). A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation and internal quotations omitted). Where the movant seeks a mandatory injunction, rather than prohibitory, injunctive relief is "subject to a heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party." *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993).[4]

---

[3] The Ninth Circuit observes a "sliding scale" approach, in that these elements "are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, by example, an injunction can issue where there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

[4] "A mandatory injunction orders a responsible party to take action," while "a prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos*

III.    **DISCUSSION**

To determine whether a preliminary injunction is appropriate, the Court must now address each of the four *Winter* factors and decide whether Plaintiffs have made sufficient showings that each of the factors weigh in favor of injunctive relief.

### A. Likelihood of Success on the Merits

"To establish a substantial likelihood of success on the merits, [a plaintiff] must show 'a fair chance of success.'" *In re Focus Media Inc.*, 387 F.3d 1077, 1086 (9th Cir. 2004) (citation and internal quotations omitted). Under the Ninth Circuit's sliding scale approach, an injunction may issue even where a plaintiff makes a somewhat *weaker* showing on the "likelihood of success" factor, so long as the plaintiff (i) establishes that there are at least "serious questions" going to the merits of the claim and (ii) makes a particularly strong showing on one of the other factors, such as irreparable harm or the balance of hardships. *See All. for the Wild Rockies*, 632 F.3d at 1131 ("This circuit has adopted and applied a version of the sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'"); *Shebanow v. First Magnus Fin. Corp.*, No. 3:10-cv-00765-RCJ-RAM, 2010 WL 5390132, at *3 (D. Nev. Dec. 22, 2010) ("A claim can be weaker on the merits if it raises 'serious questions' and the amount of harm the injunction will prevent is very great.").

"To prevail on the motion, plaintiffs need only show a likelihood of success on the merits/serious questions as to *one* of their claims for relief." *De Anda Enters., Inc. v. JL Deanda Enters. LLC*, No. SA CV 16-2049-DOC (JCGx), 2017 WL 2960796, at *2 (C.D. Cal. Apr. 11, 2017) (emphasis in original) (citation and internal quotations omitted). Here, although Plaintiffs assert five claims, they only address this factor with respect to two of them: breach of fiduciary duty and misappropriation of trade secrets. (Doc. 2 at 9–14).

---

*Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). "The 'status quo' refers to the legally relevant relationship between the parties before the controversy arose." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060–61 (9th Cir. 2014).

Accordingly, this Court's analysis will focus on Plaintiffs' likelihood of success on only these two claims and will "not consider herein all of [P]laintiffs' claims nor all of the grounds for [P]laintiffs' claims." *De Anda Enters., Inc.*, 2017 WL 2960796, at *2.

### 1. Breach of Fiduciary Duty

Under Arizona law, the elements of a breach of fiduciary duty claim are "the existence of a duty owed, a breach of that duty, and damages causally related to such breach." *Surowiec v. Cap. Title Agency, Inc.*, 790 F. Supp. 2d 997, 1004 (D. Ariz. 2011). The parties here chiefly dispute whether Defendant had a fiduciary duty to Plaintiffs, and more specifically, *when* that fiduciary duty was in existence. Plaintiffs argue that Defendant had a fiduciary duty from the very beginning of his relationship with TBH— that is, that the fiduciary relationship began on October 1, 2021 when Defendant signed the Consulting Services Agreement ("CSA") and became a consultant for TBH. According to Plaintiffs, that fiduciary relationship continued until he resigned as TBH's CEO on May 15, 2022. Defendant, however, argues that no fiduciary relationship existed *until* Defendant became TBH's CEO on April 29, 2022. Therefore, Defendant's view is that he had a fiduciary duty to Plaintiffs only during his two-week stint as CEO.

As a starting point, Defendant does not dispute that he had a fiduciary duty to Plaintiffs while he was CEO of TBH—*i.e.*, between April 29, 2022, and May 15, 2022. (*See* Doc. 16 at 12 ("The [fiduciary] duty attached when [Defendant] became CEO.")). Additionally, there is no question that Defendant's fiduciary relationship with Plaintiffs ceased upon his resignation as CEO. *See Standage v. Planned Inv. Corp.*, 160 Ariz. 287, 291 (Ct. App. 1988) (quoting *Microbiological Rsch. Corp. v. Muna*, 625 P.2d 690, 695 (Utah 1981)) ("When a corporate officer ceases to act as such, because of his resignation or removal, the fiduciary relationship ceases."). Thus, the dispute only concerns whether Defendant had a fiduciary relationship with Plaintiffs during the time he was a consultant for TBH, between October 1, 2021 and April 29, 2022.

Under Arizona law, "a fiduciary relationship is a confidential relationship whose attributes include great intimacy, disclosure of secrets, or [e]ntrusting of power." *Standard*

*Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 24 (Ct. App. 1996) (citations and internal quotations omitted). In a fiduciary relationship, the beneficiary becomes a "trusting party" who is impelled or induced into "relax[ing] the care and vigilance he would ordinarily exercise." *Cook v. Orkin Exterminating Co., Inc.*, 227 Ariz. 331, 334 (Ct. App. 2011). The fiduciary, on the other hand, "is bound to act for the benefit of the other." *Taeger v. Cath. Fam. & Cmty. Servs.*, 196 Ariz. 285, 290 (Ct. App. 1999). At the same time, "the fiduciary holds 'superiority of position' over the beneficiary," which "may be demonstrated in material aspects of the transaction at issue by a 'substitution of the fiduciary's will.'" *Standard Chartered*, 190 Ariz. at 24 (citations omitted). The facts must demonstrate that the relationship involved "peculiar reliance in the trustworthiness of another"; "[m]ere trust in another's competence or integrity does not suffice." *Id.* (citations omitted). The level of intimacy and trustworthiness in a fiduciary relationship "distinguishes [it] from an arm's length relationship." *Id.*

In this case, the CSA—rather than creating a fiduciary relationship—created a contractual arrangement under which Defendant agreed to perform consulting services and Plaintiffs agreed to pay for those services. *See Cook*, 227 Ariz. at 334 (citation omitted) ("Generally, commercial transactions do not create a fiduciary relationship unless one party agrees to serve in a fiduciary capacity."); *see also Urias v. PCS Health Sys., Inc.*, 211 Ariz. 81, 87 (Ct. App. 2005) (citation omitted) ("A commercial contract creates a fiduciary relationship only when one party agrees to serve in a fiduciary capacity."). In fact, the CSA explicitly *rejects* any sort of fiduciary characterization of the parties' relationship:

> 10.1.  <u>Relationship Between Parties</u>. Consultant is an independent contractor and is not an employee or agent of Company. Nothing contained in this Agreement shall be construed to (i) give either party the power to direct or control the activities of the other, (ii) constitute the parties as partners, joint venturers, agents, co-owners, or otherwise as participants in a joint undertaking, or (iii) allow either party to create or assume any obligation on behalf of the other party for any purpose whatsoever.

(Doc. 22-1 at 7); *see also Urias*, 211 Ariz. at 87 ("The Agreement . . . specified that the

parties were independent contractors and did not purport to create a fiduciary relationship."). If Plaintiffs intended a fiduciary relationship—as they now argue existed—they could have negotiated for language in the CSA to that effect. Instead, the above CSA provision is strong evidence that no fiduciary relationship was intended by the parties.[5]

Even if the Court focuses on the parties' relationship as it actually transpired—and sets aside the CSA entirely—the Court still cannot find evidence of a fiduciary relationship.[6] Plaintiffs failed to provide evidence suggesting that Defendant agreed to serve as Plaintiffs' fiduciary or "that the parties' relationship involved any of the hallmarks of a fiduciary association: intimacy, secrets, or the entrusting of power." *Cook*, 227 Ariz. at 334. In fact, Plaintiffs' briefing fails to address the issue altogether. Instead, Plaintiffs rely on the fiduciary duties that arose from Defendant's role as CEO and do not make any explicit argument that such duties were attached to Defendant's consulting work as well. (*See* Doc. 2 at 9–10). At the Hearing, Plaintiffs were directly asked whether Defendant had any fiduciary duty to TBH prior to him becoming CEO. Given an opportunity to provide the argument that was absent from their briefing, Plaintiffs' counsel only responded "yes" and did not elaborate. (Hearing Tr. at 40:22–41:3).[7]

---

[5] The Court finds it telling that Plaintiffs opted *against* filing the entire CSA as an exhibit to their Motion. Instead, Plaintiffs merely quoted a single, favorable section from the CSA and withheld the rest. (*See* Doc. 2 at 3). By doing so, Plaintiffs kept under wraps the above-excerpted provision concerning the "Relationship Between Parties." The CSA was eventually provided to the Court—albeit by Defendant, not Plaintiffs—after the Court requested its filing at the Preliminary Injunction Hearing. (*See* Doc. 22-1).

[6] Under California law, "even in cases where the contract itself does not establish a fiduciary relationship, extrinsic factors may 'elevate a contractual relationship to a fiduciary one.'" *Alvarado Orthopedic Rsch., L.P. v. Linvatec Corp.*, No. 11-CV-246-IEG (RBB), 2011 WL 3703192, at *4 (S.D. Cal. Aug. 23, 2011). For purposes of this analysis, the Court presumes that Arizona law is in agreement—that is, that the contract is not dispositive, and that "extrinsic factors" may indicate the existence of a fiduciary relationship even where the contract provides otherwise. That said, Plaintiffs fail to provide—and this Court was itself unable to find—any Arizona caselaw explicitly aligning with California law on this point.

9

That said, the issue arose at other points during the Hearing and—in those instances—Plaintiffs' counsel cited to an Arizona Court of Appeals case, *AMERCO v. Shoen*, 184 Ariz. 150 (Ct. App. 1995), for the apparent proposition that Arizona law automatically imposes a fiduciary relationship between a corporation and its directors, officers, employees, agents, and consultants or advisors. (*See* Hearing Tr. at 11:6–11:8; 26:13–26:21; 50:4–50:21).[8] After reviewing *AMERCO*, however, the Court finds this to overstate the case's holding. In *AMERCO*, the Court of Appeals addressed whether the trial court inadequately instructed the jury as to the plaintiffs' breach of fiduciary duty claim. *AMERCO*, 184 Ariz. at 156. One of the jury instructions provided that "[t]he relationships between a corporation and its directors and officers, employees, agents and consultants or advisors are fiduciary relationships." *Id.* at 157. This Court's review of caselaw, as discussed above, shows that the existence of a fiduciary relationship depends less on the alleged fiduciary's job title and more on the substantive nature of the parties' relationship. Despite what the jury instruction in *AMERCO* may imply, just because one acts as a company's "consultant" does not automatically mean that he or she is the company's fiduciary; instead, a fiduciary relationship only exists where the parties' relationship is defined by a level of "intimacy, secrets, or the entrusting of power." *Cook*, 227 Ariz. at 334. This is particularly true where—as here—the individual is merely an independent contractor, rather than an employee, of the company. Although Defendant's job title may have been as a "consultant" of TBH, Plaintiffs have failed to provide sufficient evidence for a finding that this role created a fiduciary relationship.

All told, Plaintiffs have not provided facts that give rise to a fiduciary relationship prior to Defendant becoming CEO, and the Court will not accept Plaintiffs' conclusory allegation that such a relationship existed. The Court finds that no fiduciary relationship

---

[7] "Hearing Transcript" refers to the transcript of the Preliminary Injunction Hearing held before this Court on June 14, 2022.

[8] Plaintiffs also cited this case in their Motion. (*See* Doc. 2 at 10).

10

existed during the approximately seven months that Defendant was TBH's consultant and that the fiduciary relationship only existed during Defendant's short tenure as CEO.

Having determined that a fiduciary relationship existed only during the two weeks Defendant was CEO, the Court now returns to its overarching inquiry as to whether Plaintiffs have shown a likelihood of success on the merits of their claim that Defendant breached that duty. The Arizona Supreme Court has characterized the fiduciary duty as imposing obligations of loyalty, good faith in dealings, and requiring a high degree of care. *In re Sky Harbor Hotel Props., LLC*, 246 Ariz. 531, 533 (2019). It follows that there are more ways than one for a breach of the fiduciary duty to occur. Plaintiffs' breach theory is based on the corporate opportunity doctrine, and Plaintiffs' allegation that Defendant usurped—and intends to continue to usurp—corporate opportunities belonging to Plaintiffs. Plaintiffs allege that Defendant used his position as CEO to develop the Elk Valley opportunity, and then resigned from his position as CEO so that he could pursue the Elk Valley project in his individual capacity, thereby "stealing" the opportunity for himself. (Doc. 2 at 10). Defendant does not deny that he intends to pursue the Elk Valley project on his own, but asserts that doing so does not constitute a breach because (i) he gained access to the opportunity *prior to* his time as CEO and therefore prior to the existence of any fiduciary duties; (ii) he did not use his position as CEO to develop the opportunity or otherwise gain any particular advantage over TBH in pursuing the project; and (iii) he is free to compete with TBH now that their fiduciary relationship is over. (Doc. 16 at 12–13).

"The corporate opportunity doctrine 'prohibits fiduciary usurpation of a corporate opportunity.'" *Taser Int'l, Inc. v. Ward*, 224 Ariz. 389, 398 (Ct. App. 2010) (citing *AMERCO*, 184 Ariz. at 158; *Tovrea Land & Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 122 (1966)). The general principle is that "a director or officer may not seize for himself, to the detriment of his company, business opportunities in the company's line of activities in which it has an interest or prior claim." *Id.* at n.20 (quoting *Tovrea*, 100 Ariz. at 122). However, the Arizona Supreme Court has "adopted a somewhat narrow view of the corporate opportunity doctrine," finding that:

> [t]he more precise test is whether the director has a specific duty to act in regard to the particular matter as a representative of the company. If there is no such duty, the director may acquire outside interests although the corporation may be more or less interested.

*Id.* (quoting *Tovrea*, 100 Ariz. at 122). "The opportunity must actually exist and not be merely 'abstractly contemplated.'" *Powers Steel & Wire Prods., Inc. v. Vinton Steel, LLC*, No. 1 CA-CV 20-0652, 2021 WL 5495289, at *7 (Ariz. Ct. App. Nov. 23, 2021) (quoting *Taser*, 224 Ariz. at 399).

Here, the Elk Valley project likely falls within the scope of a corporate opportunity for purposes of the corporate opportunity doctrine. Plaintiffs provide evidence showing numerous instances in which Defendant referred to the Elk Valley project as being TBH's opportunity as well and in which Defendant's actions implied that he was pursuing the project on TBH's behalf. For example, after sharing the Elk Valley opportunity with TBH, Defendant pursued the project by engaging in discussions and conducting a meeting with members of the Elk Valley tribe and representatives of the County. In doing so, he referred to himself as TBH's CEO and Partner—even though, at that point, he was merely TBH's consultant—and he notified members of the tribe and the County of TBH's involvement. (Doc. 16-2 at 5). Defendant also provided updates to Dr. Shufeldt and TBH concerning the Tribal Council's apparent openness to the project. (*See, e.g.*, Doc. 2 at 3–4 ("Defendant informed . . . Dr. Shufeldt via text message that 'the [tribal] council is on board' and 'willing [to let TBH] manage the [behavioral health] services.'")). In various text messages and emails, Defendant referred to the Elk Valley project as belonging to "us" and being "ours", implying that TBH had an interest in the project as well. (*See, e.g.*, Doc. 2-1 at 20, 22, 27, 33, 35–37). Defendant's repeated representations concerning TBH's involvement in the Elk Valley project support this Court's finding that, once Defendant became CEO, he had a "specific duty" to act as a TBH's representative in the company's pursuit of the project. Thus, at least while he was acting as TBH's CEO, Defendant had a duty to not seize the Elk Valley project for himself to the detriment of the company.

Critically, however, the fact that Defendant had a duty to not seize the project for

12

himself while he was CEO does not necessarily mean that he breaches that duty by pursuing the project after his resignation. This is because Defendant's fiduciary duties ceased upon his resignation from TBH. *See Standage*, 160 Ariz. at 291 (noting that fiduciary relationship ceases upon corporate officer's resignation or removal). Moreover, Arizona law provides that, while employees are generally "precluded from actively competing with [their] employer[s] *during* the period of employment," a former employee is "free to compete" with his former employer "in the absence of an enforceable non-compete agreement." *Taser*, 224 Ariz. at 394 (emphasis added). Indeed, the corporate opportunity doctrine "does not extend to all business ideas discussed or learned about in the course of employment because 'such an extension would have the effect of unnecessarily restraining competition' and 'would effectively transform an at-will employment relationship to one bound by a de facto non-compete agreement.'" *Powers Steel & Wire*, 2021 WL 5495289, at \*7 (citing *Taser*, 224 Ariz. at 399).

Here, it is undisputed that Defendant's fiduciary relationship with Plaintiffs ceased upon his resignation from the CEO position. It is also undisputed that Defendant never signed a non-compete agreement as it relates to Plaintiffs. (*See* Hearing Tr. at 42:21–43:2 (both parties responding "no" when asked whether Defendant, at any point, signed noncompete agreement with TBH)). Thus, the fact that Defendant *now* seeks to pursue the Elk Valley project in his individual capacity does not appear, at first glance, to constitute a breach of his fiduciary duties to Plaintiffs because, as a former employee, Defendant is generally free to compete with Plaintiffs in the absence of a non-compete agreement.

The issue is not so simple, however, because Arizona law recognizes several limitations to the general principles articulated above. Although it is generally true that fiduciary duties cease upon employment termination and that former employees are free to compete in the absence of a non-compete agreement, courts have cautioned that "where a transaction has its inception *while the fiduciary relationship is in existence*, an employee cannot by resigning and not disclosing all he knows about the negotiations, subsequently continue and consummate the transaction in a manner in violation of his fiduciary duties."

13

*Standage*, 160 Ariz. at 291 (quoting *Microbiological Rsch. Corp.*, 625 P.2d at 695) (emphasis added). This limitation does not apply here, however, because the Elk Valley project had its "inception" *prior to* the existence of any fiduciary relationship. According to Defendant, there were at least two discussions related to the development of a healthcare facility for the Elk Valley tribe in early 2020 and again in May 2021. The Court finds that these discussions were merely preliminary, speculative discussions, though, and that they were not substantial enough to constitute the "inception" of the project. Instead, the most substantive advancements of the Elk Valley project took place in March and April 2022. By that point, the new casino had opened, leaving the old casino location vacant and available for conversion into a healthcare facility. Defendant had substantive discussions, including a formal meeting, with members of the Elk Valley Tribal Council and with County representatives. Defendant relayed to TBH that the tribe was "on board" with the project. Defendant also informed the County that TBH would prepare an analysis of the proposed project for the County's review. These developments—which this Court finds to collectively constitute the "inception" of the Elk Valley project—took place while Defendant was acting as TBH's independent contractor consultant and *prior to* the existence of any fiduciary relationship between Defendant and Plaintiffs. Therefore, this case does not fall within the limitation provided in *Standage*.

Aside from the *Standage* limitation, Arizona law also recognizes that "an agent has a duty (1) not to use property of the principal for the agent's own purposes and (2) not to use or communicate confidential information of the principal for the agent's own purposes." *Taser*, 224 Ariz. at 396 (citing Restatement (Third) of Agency § 8.05). Critically, these duties concerning the principal's property and confidential information continue *even after* termination of the employment relationship. *Id.* at 397 (citing Restatement (Third) of Agency § 8.05 cmt. c). The duty of confidentiality is rather broad, as it "extends to all such information concerning a principal even when it is not otherwise connected with the subject matter of the agency relationship." *Id.* (citing Restatement (Third) of Agency § 8.05 cmt. c). However, a former employee does *not* violate the duty

of confidentiality by merely using "skills and more general knowledge, although learned in the course of work done for the former principal, in the course of competition." *Id.* (quoting Restatement (Third) of Agency § 8.04 cmt. c).

Thus, Defendant's individual pursuit of the Elk Valley project may breach his fiduciary duties to Plaintiffs—even *after* his resignation—if his pursuit is considered a use of Plaintiffs' property or confidential information for Defendant's own purposes. On this question, the Court finds evidence weighing both ways. On one hand, the Elk Valley project may be considered Plaintiffs' "property." The Restatement provides that the "property of a principal is defined broadly and includes intangible as well as tangible assets." Restatement (Third) of Agency § 8.05 cmt. b. It further provides that a breach of the fiduciary duty may occur where "an agent . . . use[s] a principal's property without the principal's consent . . . by competing with the principal . . . or developing a business opportunity that should not have been taken personally by the agent." *Id.* In this case, all substantive progress on the Elk Valley project was made while Defendant was acting as TBH's consultant and presumably acting on TBH's behalf. As discussed above, Defendant shared the opportunity with TBH, referred to the project as being TBH's, held himself out as a TBH representative to the tribe and the County, disclosed TBH's involvement to the tribe and the County, and regularly communicated the project's progress to Dr. Shufeldt and others at TBH. Contrary to Defendant's assertion that Plaintiffs contributed little to the project's development, (Doc. 16 at 16), it was TBH who retained and paid Via Healthcare for the report that was intended to aid TBH's final presentation of the project to the tribe and the County. These facts indicate that Plaintiffs had a distinct interest in and claim to the Elk Valley project, and they support a finding that the project constituted Plaintiffs' "property" that Defendant was precluded from using for his own purposes, even after his resignation. Likewise, the facts could also support a finding that the Elk Valley project was "confidential information" that Defendant was similarly precluded from using. As to a former employee's duty of confidentiality, the Restatement provides that:

> Many employees and other agents are given access by the

principal to information that the principal would not wish to be revealed or used, except as the principal directs. Such information may pertain to the principal's business plans, personnel, nonpublic financial results, and operational practices, among a range of possibilities. The value of some types of confidential information is recognized by trade-secret law, which protects "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others."

Restatement (Third) of Agency § 8.05 cmt. c (quoting Restatement Third, Unfair Competition § 39). In his role as CEO, Defendant had access to all information concerning the Elk Valley project, including information that is "sufficiently valuable and secret to afford actual or potential economic advantage over others." *Id.* By resigning and pursuing the project on his own, a plausible argument could be made that Defendant used and intends to continue to use that information for his own benefit, in violation of his fiduciary duties.

On the other hand, there is also evidence suggesting that the Elk Valley project was not "property" or "confidential information" belonging to Plaintiffs. The project originated in discussions between Defendant and Ms. Green in early 2020, long before TBH was even in existence. It was Defendant who shared the prospective project with TBH, and it was Defendant who proposed the idea to the tribe and the County in March and April 2022. Defendant, and not TBH, was the sole point of contact concerning the project from the perspective of the tribe and the County. His central role in getting the project off the ground is underscored by Ms. Green's assertion that the Elk Valley tribe has no interest in pursuing the project without Defendant and that it was Defendant who they believed they were dealing with.[9] (Doc. 16-2 at 5–6). Although his efforts to develop the project during those

---

[9] The Court acknowledges Plaintiffs' contention that Ms. Green "does not claim to be speaking on behalf of the tribe or to be authorized to do so regarding this matter or anything else" and that her opinion should be discounted. (Doc. 17 at 8). Indeed, Ms. Green expresses this herself in her Declaration. (*See* Doc. 16-2 at 3 ("The facts stated herein are made in my individual capacity and I am not speaking for the Tribal Council, UIHS' Board of Directors or my family.")).

That said, Ms. Green has been a member of the Elk Valley Tribal Council since approximately 2003, and it is her family that owns the old casino property upon which the

months occurred while he was contracted as TBH's consultant, his role with TBH was merely as an independent contractor who had no fiduciary duties to Plaintiffs. At the Hearing, the parties indicated that Defendant was never even paid for his independent contract work, although this was apparently because Defendant never submitted an invoice to TBH. Even so, this fact supports an argument that Defendant never actually worked for TBH and that he pursued the Elk Valley project in his own capacity. Moreover, it is unclear what resources or other contributions Plaintiffs provided to develop the project, aside from paying for the Via Healthcare report. Rather, Defendant argues that Plaintiffs contributed little in pursuit of the project, and that the project is and always has been his own business opportunity. Altogether, these facts support a finding that Defendant's pursuit of the Elk Valley project is purely his own, and that it is not an improper use of Plaintiffs' property or confidential information.

In sum, the Court finds that there are at least serious questions going to the merits of Plaintiffs' breach of fiduciary duty claim. There are facts to indicate that Plaintiffs established an interest in the Elk Valley project such that the project constituted "property" or otherwise involved "confidential information" belonging to Plaintiffs. In that case, Defendant's post-resignation pursuit of the project arguably constitutes a use of Plaintiffs' property or confidential information in violation of his fiduciary duty to Plaintiffs. That said, there are also facts indicating that Defendant has an interest and prior claim to the Elk Valley project independent of his relationship with TBH. Such facts indicate that Plaintiffs did not have an exclusive interest in the project such that it became Plaintiffs' property or confidential information. In this regard, Defendant should be free to pursue the project, even if that means competing with TBH, because he no longer works for the company.

At this early stage of the case—and with the facts that have been provided—the

---

proposed healthcare facility would be built. Moreover, the project was first conceptualized in conversations between Ms. Green and Defendant. Thus, the Court finds Ms. Green's statements to be informative while simultaneously recognizing that they only represent her own opinion and not that of anyone else.

Court simply cannot resolve this dispute. *See Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) (citation omitted) ("In deciding a motion for a preliminary injunction, the district court 'is not bound to decide doubtful and difficult questions of law or disputed questions of fact.'"). Therefore, given the competing facts on this issue, Plaintiffs have failed to show a *substantial* likelihood of success on the merits of their breach of fiduciary claim. However, the Court finds that Plaintiffs have shown that there are at least serious questions going to the claim's merits. As such, the Court may still issue an injunction that enjoins Defendant from pursuing the Elk Valley project, but *only if* Plaintiffs make particularly strong showings as to the "irreparable harm" or "balance of hardships" factors.

### 2. *Misappropriation of Trade Secrets*

A claim for misappropriation of trade secrets under the Arizona Uniform Trade Secrets Act, A.R.S. § 44-401 *et seq.*, requires the plaintiff to prove two elements: (1) that a legally protectable trade secret exists and (2) that the defendant misappropriated the trade secret through improper means. *Joshua David Mellberg LLC v. Will*, 96 F. Supp. 3d 953, 972 (D. Ariz. 2015). As to the first element, "[a] trade secret is information that derives independent economic value 'from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use' and is 'the subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" *HTS, Inc. v. Boley*, 954 F. Supp. 2d 927, 944–45 (D. Ariz. 2013) (quoting A.R.S. § 44-401(4)). In other words, the first element is established if (i) the subject matter of the information is secret and (ii) reasonable efforts were taken to keep the information secret. *Calisi v. Unified Fin. Servs., LLC*, 232 Ariz. 103, 106 (Ct. App. 2013). "A trade secret is not simply information as to single or ephemeral business events. Rather, a trade secret may consist of a compilation of information that is continuously used or has the potential to be used in one's business and that gives one an opportunity to obtain an advantage over competitors who do not know of or use it." *Id.* (internal quotations omitted) (citing *Enter. Leasing Co. of Phx. v. Ehmke*, 197 Ariz. 144, 148 (Ct. App. 1999)).

18

Here, Plaintiffs allege that Defendant misappropriated two trade secrets: (i) the Via Healthcare report and (ii) a list of customer/client leads. As to the Via Healthcare report, Defendant does not dispute that the report is confidential. Defendant argues that this is irrelevant, however, because Defendant has and will not use the report for any purpose because it is not helpful to him. (Doc. 16 at 15). That said, Defendant apparently still has the report in his possession and has not turned it over to Plaintiffs. Plaintiffs argue the report is a protectable trade secret because it has independent economic value (TBH paid $51,000 for it) and because TBH made reasonable efforts to protect its secrecy by having Defendant sign a non-disclosure agreement. (Doc. 2 at 12). The Court finds that the Via Healthcare report is a legally protectable trade secret. The report contains a feasibility analysis intended "to provide information to [the] County and the Elk Valley tribe to assist in consummating the Elk Valley opportunity." (*Id.* at 12–13). The independent economic value of such information is evident from the $51,000 price which TBH paid for it. The information in the report is useful to a business—such as TBH—that is pursuing the development of a healthcare facility on tribal land and gives such a business an advantage over its competitors in securing the project. Additionally, the non-disclosure agreements and Defendant's concession that the report is confidential support this Court's conclusion that the report was the subject of reasonable efforts by TBH to maintain its secrecy.

As to the list of customer/client leads, Arizona law provides that customer information may constitute a legally protectable trade secret if it is "truly confidential and to a substantial degree inaccessible." *Amex Distrib. Co., Inc. v. Mascari*, 150 Ariz. 510, 516 (Ct. App. 1986). For a customer list, "trade secret protection does not depend on whether the 'list' misappropriated is in written form or memorized." *Calisi*, 232 Ariz. at 106. Instead, Arizona courts use a series of factors to determine whether a customer list may be entitled to trade secret protection. *Id.* Such factors include:

> (i) whether the list "represents a selective accumulation of detailed, valuable information about customers—such as their particular needs, preferences, or characteristics—that naturally 'would not occur to persons in the trade or business'";

1

2

   (ii) whether the claimant "demonstrates it compiled the list by expending substantial efforts to identify and cultivate its customer base such that it would be difficult for a competitor to acquire or duplicate the same information";

3

4

5

   (iii) "whether the information contained in the customer list derives independent economic value from its secrecy, and gives the holder of the list a demonstrable competitive advantage over others in the industry"; and

6

7

   (iv) "the extent to which the claimant divulged its customer list externally and internally, *i.e.*, to people outside of its business as well as to its own employees."

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

*Id.* at 106–07 (citations omitted). In the present case, the list of customer/client leads sufficiently meets these factors. First, the list contains confidential business-opportunity leads for TBH. Defendant asserts that the list of leads contains only the names of federally recognized tribes and that—because such names are publicly available information—the list does not represent information that naturally would not occur to other persons in the industry. (Doc. 16 at 15). Plaintiffs argue that the list not only includes the names of the tribes, but also information about their receptivity to contact and about their self-identified needs, operational challenges, and staffing information. (Doc. 2 at 13). This Court's in camera review of the list reveals that it does include more information than just the names of the tribes. For example, it includes specific points of contact for each tribe, information about their level of interest in a project, and whether they should be contacted. Moreover, given that TBH paid for these leads through a "third party, B2B lead vendor," the Court finds that the list contains detailed, valuable information that would not naturally occur to persons in the trade or business and that the list was generated by expending substantial efforts such that it would be difficult for a competitor to acquire or duplicate it. The list presumably gives TBH a competitive advantage over others in the industry because it provides information—such as the unique healthcare needs or points of contact for each tribe—that can be difficult to obtain. Finally, there is no evidence that the list was divulged to anyone outside of TBH or even to others *within* TBH outside of Dr. Shufeldt and Defendant. All told, the Court concludes that Plaintiffs have shown that the list of

28

customer/client leads is a likely a legally protectable trade secret.

Turning to the second element, Defendant has apparently refused to turn over to Plaintiffs the Via Healthcare report or the list of customer/client leads, despite specific requests from Plaintiffs to do so. Although Defendant asserts he has no need for or intent of using either document, Defendant offered no reason—in his briefing or at the Hearing—to support his decision to keep them in his possession and away from Plaintiffs. Given that Defendant plans to continue his work in Plaintiffs' industry—that is, developing healthcare projects on tribal lands—it stands to reason that the documents offer Defendant value. Defendant has not given the Court any reason to believe his contentions that he will not use them. Thus, the Court finds that Plaintiffs have established a likelihood of success on the merits of their misappropriation of trade secrets claim, as to both the Via Healthcare report and the list of customer/client leads.

## B. Irreparable Harm

Having found serious questions going to the merits of Plaintiffs' breach of fiduciary duty claim and a likelihood of success on the merits of his misappropriation of trade secrets claim, the Court now turns to the second *Winter* factor: whether Plaintiffs have shown that irreparable harm will result absent an injunction. To show irreparable harm, "a plaintiff must demonstrate immediate threatened injury." *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Id.* (citing *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984)). A finding of irreparable harm also requires a finding that legal remedies, such as damages, are inadequate. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). The Supreme Court has held that "plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *All. for the Wild Rockies*, 632

21

F.3d at 1131 (citing *Winter*, 555 U.S. at 22). As noted above, because Plaintiffs here only showed serious questions—rather than a *substantial* likelihood of success—on the merits of their breach of fiduciary duty claim, Plaintiffs must make a *particularly strong* showing of irreparable harm to meaningfully succeed in enjoining Defendant from pursuing the Elk Valley project. Such a particularly strong showing is *not* necessary, however, with respect to the harms associated with Defendant's alleged misappropriation of trade secrets.

Absent an injunction, Plaintiffs assert they will suffer irreparable harm because Defendant will impermissibly use Plaintiffs' confidential information, steal Plaintiffs' customers, and otherwise harm Plaintiffs' reputation and customer goodwill. (Doc. 2 at 14–15). Indeed, courts have found that the loss of customers, business reputation, and customer goodwill *can* constitute irreparable harm. *See Krueger Invs., LLC v. Cardinal Health 110, Inc.*, No. CV 12-618-PHX-JAT, 2012 WL 3028349, at *5 (D. Ariz. July 24, 2012) (citations omitted) ("Courts can consider economic hardship, actual or threatened loss of customers, business reputation, and goodwill in determining the presence and sufficiency of irreparable harm."). In this case, at least with respect to the Via Healthcare report and the list of customer/client leads, the Court agrees that Plaintiffs face a likelihood of irreparable harm absent an injunction enjoining Defendant from using those documents and ordering him to turn them over to Plaintiffs. The documents contain valuable business information that Plaintiffs paid for and that is useful in Plaintiffs' business pursuits. Should such information fall into the hands of competitors, Plaintiffs may lose the business advantage that Plaintiffs rightfully obtained by paying third parties for the report and the customer leads. This is particularly true for a new company like TBH, which has not yet completed a substantial project and whose reputation in the Indigenous healthcare industry is therefore particularly vulnerable. More generally, the improper use or public disclosure of trade secrets—such as the report or list of customer/client leads in this case—"destroys the information's status as a trade secret." *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)). "This harms the trade secret owner by both depriving him of a property interest . . . and by

allowing his competitors to reproduce his work without an equivalent investment of time and money." *Id.* (citing *Winston Rsch. Corp. v. Minn. Mining & Mfg. Co.*, 350 F.2d 134, 142 (9th Cir. 1965)). Such harms "are not readily addressed through payment of economic damages" and "are sufficient to meet the irreparable injury requirement for a preliminary injunction." *Id.*

Turning to the Elk Valley project, Plaintiffs argue that, absent an injunction, Defendant will steal the project from TBH and cause irreparable harm to Plaintiffs' reputation and customer goodwill. (Doc. 2 at 14–15). According to Plaintiffs, the harm related to losing the Elk Valley project is particularly difficult to quantify "because, although negotiations are at a very advanced stage, a final agreement has not been reached." (*Id.* at 15). Additionally, TBH is a new company, and the Elk Valley tribe is "essentially its first customer." (*Id.*). Thus, Plaintiffs argue that the losing the Elk Valley project would cause "uncertain—but enormous—losses in terms of goodwill, reputation, and cascading lost opportunities across TBH and Tribal Health." (*Id.*). Finally, Plaintiffs are concerned that Defendant has already damaged or even destroyed TBH's goodwill with the Elk Valley tribe given that Defendant is now claiming that the tribe was never going to do business with TBH in the first place. (*Id.*).

The Court recognizes that the above harms exist but finds that they are speculative and overstated because Plaintiffs have failed to demonstrate that they have a legally protectable interest and exclusive claim to the Elk Valley project. Although unique harms may indeed exist where a new company such as TBH loses what is "essentially its first customer," the Court's extensive analysis with respect to the first *Winter* factor shows that TBH's claim to the Elk Valley tribe as a client is more tenuous and uncertain than Plaintiffs represent. Aside from paying for the Via Healthcare report, there is little evidence that Plaintiffs meaningfully contributed to the March and April 2022 developments on the project. Instead, Defendant—who was acting as an independent contractor and was not paid by Plaintiffs for the work—was the primary force behind the progress that was made. Moreover, Ms. Green's Declaration demonstrates that the Elk Valley tribe and the County

view Defendant as being more central to the project than TBH. Ms. Green even goes so far as to state that—if Defendant is enjoined from pursuing the project—she would withhold any recommendation that the Elk Valley tribe move forward on the project with TBH. While Ms. Green represents just one opinion on the issue, the Court cannot overlook her statements entirely, given that she is a member of the Tribal Council, and it is her family that owns the property where the healthcare facility is proposed to be built. Considering the real possibility that TBH has already lost the project with the resignation of Defendant, the Court cannot confidently conclude that enjoining Defendant from pursuing the project on his own would do anything to assuage the irreparable harms Plaintiffs assert. Even assuming Plaintiffs have shown some possibility of irreparable harm absent an injunction, Plaintiffs have failed to show that "the amount of harm the injunction will prevent is *very* great," as is required where a plaintiff can only show "serious questions" going to the merits rather than a substantial likelihood of success. Thus, the irreparable harm factor weighs against issuing an injunction enjoining Defendant from pursuing the Elk Valley project.

### C. Balance of the Equities/Hardship

As to the third required element for a preliminary injunction, the Court finds that the balance of hardships tips in Plaintiffs' favor, but only with respect to injunctive relief aimed at protecting Plaintiffs' trade secrets—*i.e.*, the Via Healthcare report and the list of customer/client leads. When analyzing this element, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24; see also *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) ("In evaluating the balance of hardships a court must consider the impact granting or denying a motion for [an] injunction will have on the respective enterprises.").

Here, enjoining Defendant from disclosing or using the Via Healthcare report and the list of customer/client leads—and ordering him to return possession of those documents to Plaintiffs—would cause little hardship to Defendant because Defendant has repeatedly asserted, in his briefing and at the Hearing, that he has no need for the documents nor any

24

intention of using them. If Defendant truly has no use for the documents, then there are presumably no hardships to Defendant if he is enjoined from possessing or using them. Conversely, if such an injunction is *not* granted, Plaintiffs would have no access to the report, a document that they paid thousands of dollars for and that they assert will help them in their pursuit of the Elk Valley project. Likewise, Plaintiffs would also face the possibility that their list of customer/client leads—which Plaintiffs also paid for—could be used by Defendant to Plaintiffs' detriment, or that the list could be disclosed to other competitors in the industry. The Court finds that, with respect to an injunction aimed at protecting Plaintiffs' trade secrets, the balance of hardships tips sharply in Plaintiffs' favor.

However, as to an injunction enjoining Defendant from pursuing the Elk Valley project on his own, the hardships are evenly balanced between the parties. As discussed extensively above, the facts of this case show that *both* parties can make plausible arguments relating to whether Plaintiffs' have a legally protectable—and *exclusive*—interest in the project. Likewise, the parties can make equally plausible arguments as to why the balance of hardships tilts in their favor. From Plaintiffs' view, the Elk Valley project stands as their first potential customer and "largest asset." (Doc. 2 at 15). If Plaintiffs indeed have a legally protectable interest in the project, then it stands to reason that hardship would result if an injunction was not issued and Defendant was permitted to pursue, and potentially steal, the project for himself. Moreover, Defendant would not be harmed by an injunction at all because he would only be prohibited from usurping a business opportunity that belongs to TBH. Conversely, Defendant can make an equally compelling argument. From his view, the Elk Valley project was his from the beginning and TBH has no protectable interest in the project. If an injunction were issued, Defendant would be burdened by being enjoined from pursuing a project that belongs to him and that he has poured a great deal of time and effort into. In sum, the balance of hardships with respect to enjoining Defendant's pursuit of the Elk Valley project could cut either way, depending on the legal extent of Plaintiffs' interest in the project.

All told, the balance of hardships factor weighs strongly in favor of granting an

injunction relating to the Via Healthcare report and the list of customer/client leads. The balance of hardships weighs neutrally as to an injunction relating to the Elk Valley project. Thus, Plaintiffs have failed to meet their burden on the *Winter* factors—even under the Ninth Circuit's more generous, sliding-scale approach—with respect to injunctive relief relating to the Elk Valley project.

### D. Public Interest

Finally, the Court finds that a preliminary injunction in this matter—at least in the form issued by this Court—is in the public's interest. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Pure Wafer Inc. v. City of Prescott*, 275 F. Supp. 3d 1173, 1179 (D. Ariz. 2017) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). "The public interest analysis for the issuance of a[n] injunction requires [the court] to consider whether there exists some critical public interest that would be injured by the grant of [injunctive] relief." *Id.* (citation omitted). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002).

Plaintiffs' argument on this factor is that an injunction would protect Plaintiffs' business interests and rights as a company. Indeed, the public has interests in establishing fair business practices and in encouraging innovation and invention. *See Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006) (citation omitted) ("Courts have held that the public interest is served by protecting a company's right to proprietary information, business operations, and contractual rights."). The Court finds that an injunction ordering Defendant to return the Via Healthcare report to Plaintiffs and otherwise enjoining Defendant from disclosing or using the report or the list of customer/client leads would advance the public interest by protecting Plaintiffs' business operations and contractual rights, including their trade secrets, confidential information, and customer base.

Defendant argues that an injunction is *against* the public interest because it would roadblock the development of tribal healthcare facilities. Defendants assert that the public

has an interest in improving healthcare for underserved Indigenous communities. While this is a valid public interest, the Court does *not* find that an injunction ordering Defendant to return the Via Healthcare report to Plaintiffs and otherwise enjoining Defendant from disclosing or using the report or the list of customer/client leads would negatively impact Indigenous communities in a meaningful way. Defendant is not the only individual who can bring healthcare projects to fruition on tribal land. Moreover, Defendant could still pursue projects with tribes which are not on Plaintiffs' list of customer/client leads. Additionally, because this Court will not enjoin Defendant from pursuing the Elk Valley project, there is no reason to believe that the Elk Valley project would be roadblocked from moving forward, whether that be with Plaintiffs, Defendant, or some other entity seeking to develop the healthcare facility for the Elk Valley tribe.

All told, this factor weighs in favor of an injunction, albeit a more limited injunction than that requested by Plaintiffs. To the extent Plaintiffs seek an injunction protecting their business interests in the Via Healthcare report and the list of customer/client leads, the Court finds that such an injunction would be in the public interest.

## IV.   <u>CONCLUSION</u>

According to the Ninth Circuit, the scope of "an injunction must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs, rather than 'to enjoin all possible breaches of the law.'" *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004); *see also Nat'l Ry. Lab. Conf. v. Int'l Ass'n of Machinists & Aerospace Workers*, 830 F.2d 741 (7th Cir. 1987) (reviewing a district court's grant of preliminary injunction to determine "whether the scope of the injunctive provisions is wider than that necessary to prevent irreparable harm"). Here, Plaintiffs have succeeded in showing a likelihood of success on the merits of their misappropriation of trade secrets claim. The irreparable harm arising out of that claim relates only to the Via Healthcare report and the list of customer/client leads. Conversely, Plaintiffs showed that only "serious questions" existed as to the merits of their breach of fiduciary duty claim. That claim primarily concerned the Elk Valley project. Thus, to obtain an injunction enjoining Defendant from pursuing the

project, Plaintiffs were tasked with making particularly strong showings on either the irreparable harm factor or the balance of hardships factor. Plaintiffs failed to do so.

The Court must narrowly tailor its preliminary injunction to remedy only the particular harms that Plaintiffs have made sufficient showings on. Thus, the Court will enjoin Defendant from disclosing or otherwise using the Via Healthcare report and the list of customer/client leads. The Court will also order Defendant to turn those documents over to Plaintiffs. The Court will not, however, enjoin Defendant from pursuing the Elk Valley project in his individual capacity.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 2) is **granted in part and as modified** to the extent Plaintiffs request a preliminary injunction.

**IT IS FURTHER ORDERED** that the Court enters a preliminary injunction as follows:

1. Defendant, or any persons or entities acting in concert with or on his behalf, shall **identify and sequester** any and all business information, records, or documents in his or their possession containing Plaintiffs' "Confidential Information" as that term is defined in the parties' Confidentiality and Non-Disclosure Agreement. This includes the Via Healthcare Consulting Report, TBH and Tribal Health customer lists or files, and proprietary marketing plans and/or pricing data.

2. Defendant, or any persons or entities acting in concert with or on his behalf, shall be **enjoined** from **using**, **referring to**, or **divulging** TBH and Tribal Health business information, records, or documents containing Confidential Information or violating any provision of his Confidentiality and Non-Disclosure Agreement.

///
///

28

3. Defendant shall **return** to TBH and Tribal Health any and all Confidential Information that remains in Defendant's or his agent(s)' possession, custody, or control.

4. Defendant, or any persons or entities acting in concert with or on his behalf, shall be **enjoined** from **soliciting or initiating any contact with** any TBH or Tribal Health clients and confidential prospective customer leads, with **the exception of** the Elk Valley Rancheria Tribe. Defendant is **not** enjoined from soliciting, initiating contact with, or otherwise pursuing projects with representatives of the Elk Valley tribe, Del Norte County Supervisors, or any other person or entity in furtherance of developing behavioral health services on or around Elk Valley tribal lands.

Dated this 24th day of June, 2022.

Honorable Steven P. Logan
United States District Judge